# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00509-CV

---

**Texas Health and Human Services Commission, Appellant**

**v.**

**Ethan Vestal, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001435, THE HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

After Ethan Vestal was terminated from his employment at Terrell State Hospital (the Hospital), he sued the Texas Health and Human Services Commission (the Commission) under the Texas Whistleblower Act. *See* Tex. Gov't Code §§ 554.001-.010. In this interlocutory appeal, the Commission asserts that the trial court erred in denying its jurisdictional challenge to Vestal's suit. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). Specifically, the Commission argues that Vestal's suit is barred by immunity because the allegations and the evidence fail to show that Vestal was terminated because he reported illegal conduct and not for other legitimate reasons. Because we conclude that the evidence is sufficient to create a fact issue on this question, we affirm the trial court's order.

## IMMUNITY AND THE WHISTLEBLOWER ACT

The doctrine of sovereign immunity generally bars suits against the State or its subdivisions, absent a legislative waiver. *University of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 115 (Tex. 2010); *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009). Sovereign immunity implicates a court's subject-matter jurisdiction to hear a case. *Engleman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 755 (Tex. 2017). When a government defendant challenges jurisdiction based on immunity, the plaintiff's burden to affirmatively demonstrate jurisdiction includes the burden of establishing a waiver of immunity. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). To determine if the plaintiff has met that burden, the court considers the facts alleged by the plaintiff and, to the extent relevant to the jurisdictional issue, the evidence submitted by the parties. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003).

The Whistleblower Act waives a governmental entity's immunity from suit to the extent the entity is liable under the Act. *See* Tex. Gov't Code § 554.0035. Consequently, the elements of a claim under the Act are also jurisdictional facts. *Lueck*, 290 S.W.3d at 881-82. When the trial court's jurisdiction is premised on a violation of the Whistleblower Act, the plaintiff meets his burden of affirmatively demonstrating jurisdiction by alleging facts or producing evidence of facts sufficient to establish (1) that he was a public employee (2) with a good-faith belief that he was reporting a violation of the law as defined by Section 554.001, (3) that the report was made in good faith to an appropriate law-enforcement authority, and (4) he was subject to an adverse personnel action, such as suspension or termination. *See* Tex. Gov't Code § 554.002(a). Although the Whistleblower Act does not expressly include the element of "causation," the Texas Supreme Court has recognized that the plaintiff must also

2

demonstrate a "but-for" causal connection between his report and the adverse personnel action. *Office of the Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 192 (Tex. 2020); *Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995).

When, as in this case, a jurisdictional challenge to a Whistleblower Act claim challenges the existence of one or more elements of the claim, the challenge must be denied if the evidence, viewed in the light most favorable to the nonmovant, creates a genuine issue of material fact as to each of the challenged elements. *See Town of Shady Shores*, 590 S.W.3d at 552 (explaining that "when a challenge to jurisdiction that implicates the merits is properly made and supported, . . . the plaintiff will be required to present sufficient evidence on the merits of her claims to create a genuine issue of material fact"). We review the trial court's ruling on the challenge under a de novo standard of review. *Id.*

## BACKGROUND

Vestal was employed by the Hospital, which is operated by the Commission, as a psychiatric nursing assistant beginning in July 2017. According to the undisputed allegations in Vestal's pleadings and the jurisdictional evidence presented by the parties, viewed in the light most favorable to Vestal, during his employment, Vestal reported witnessing four separate incidences of alleged abuse by other hospital employees toward patients.

According to his pleadings, Vestal made his first report after he witnessed a Hospital employee, Brian Alexander, choke and then "slam a patient to the ground." That incident allegedly occurred on September 11, 2017, and Vestal reported the incident to the Department of Family and Protective Services (DFPS) that same day and a few weeks later to the Office of the Inspector General (OIG). Later that same month, Vestal made a second report after

3

a patient "with multiple bruises covering his body" informed Vestal that "a staff member had hit him multiple times." According to Vestal's deposition testimony, submitted by the Commission in support of its plea and motion, Vestal made a third report in early October 2017. In this report, Vestal notified the DFPS and then the OIG that he had discovered scratch marks and choke marks on a juvenile patient's neck. Although Vestal did not witness the incident giving rise to the marks, the juvenile's mother informed Vestal that the marks had been made by Hospital staff while attempting to restrain the juvenile. Finally, Vestal made his fourth report to the DFPS in late October 2017, after he allegedly witnessed another employee throw a juvenile to the ground and cause injury while the employee was engaged in what Vestal described as "roughhousing with the children."

On November 27, 2017, Vestal's director supervisor, Nurse Manager Anthony Brown, initiated a termination of Vestal's employment. On December 29, 2017, Nurse Administrator Leslie Wilson, Brown's supervisor, notified Vestal by letter that he was "not considered suited to the position assigned" and that his employment was terminated. On March 21, 2018, Vestal filed suit.[1]

In response to Vestal's suit, and after discovery, the Commission filed a plea to the jurisdiction combined with a no-evidence and traditional motion for summary judgment. *See id.* (explaining that challenge to existence of jurisdictional facts that also implicate merits of underlying claim may be made through plea the jurisdiction or by traditional or no-evidence motion for summary judgment). In its plea and in its traditional motion for summary judgment,

---

[1] In his original petition, Vestal named the Hospital as a co-defendant. The Commission and Hospital moved to dismiss the Hospital from the suit because, according to the Hospital, it is not a legal entity separate from the Commission and thus not a proper party. Vestal subsequently filed a notice of non-suit as to his claims against the Hospital. *See* Tex. R. Civ. P. 162 (dismissal or non-suit).

4

the Commission asserted, in part, that Vestal had failed to plead facts or produce evidence showing that the individuals who made the decision to terminate his employment had any knowledge of his alleged Whistleblower reports and, moreover, that the evidence affirmatively shows that these individuals did not learn of the alleged reports until Vestal filed suit. In its no-evidence motion for summary judgment, the Commission argued that Vestal could not succeed in his Whistleblower Act claim because he could not produce more than a scintilla of evidence on any of the elements of the claim.

Following a hearing on the Commission's plea and motion, the trial court signed an order denying the Commission's plea to the jurisdiction. In its order, the Court explained that it was denying the plea because Vestal had, "at a minimum, raised a fact question on his good faith belief" that he made his reports to "appropriate law enforcement." In the same order, the trial court also denied the Commission's no-evidence motion for summary judgment and traditional motion for summary judgment, stating in part that Vestal had presented evidence sufficient to raise a fact issue on "causation." This interlocutory appeal followed.

In one issue on appeal, the Commission argues that trial court erred in failing to dismiss Vestal's suit because, according to the Commission, Vestal failed to present more than a scintilla of evidence to show that he was fired because of his reporting and because the evidence instead shows that he was terminated solely for a legitimate reason.

**ANALYSIS**

To establish the element of causation in a Whistleblower Act case, an employee must demonstrate that he "suffered discriminatory conduct by his or her employer that would not have occurred when it did if the employee had not reported the illegal conduct." *City of*

*Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000). The employee does not, however, have to prove that his reporting was the sole cause for the employer's adverse personnel action. *Hinds*, 904 S.W.2d at 634.

Circumstantial evidence may be sufficient to establish a causal connection between an adverse employment action and the employee's good-faith reporting. *Zimlich,* 29 S.W.3d at 69. Such evidence includes: (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false. *Id.* A plaintiff need not present evidence involving all five categories to prove causation. *Texas Dep't of Crim. Justice v. McElyea*, 239 S.W.3d 842, 856 (Tex. App.—Austin 2007, pet. denied). However, the evidence must, at a minimum, "show that the person who took the adverse employment action knew of the employee's report of illegal conduct." *Kirkland v. City of Austin*, No. 03-10-00130-CV, 2012 Tex. App. LEXIS 2769, at *7 (Tex. App.—Austin Apr. 5, 2012, no pet.) (mem. op.) (quoting *Harris County v. Vernagallo*, 181 S.W.3d 17, 25 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)). "This is because the decision-maker could not fire an employee because of the employee's report of alleged illegal conduct if the decision-maker did not even know the employee made such a report." *Id.*

In response to the Commission's motion for summary judgment, and now on appeal, Vestal argues in part that he is entitled to the rebuttable presumption found in Section 554.004(a) of the Act. Section 554.004(a) provides that when the suspension, termination, or adverse personnel action occurs not later than the "90th day after the date on which the employee

6

reported a violation of law, the suspension, termination, or adverse personnel action is presumed, subject to rebuttal, to be because the employee made the report." Tex. Gov't Code § 554.004(a). When applicable, this statutory presumption relieves the employee of his initial burden to prove that he was terminated because he reported a violation of the law. *Texas A&M Univ. v. Chambers*, 31 S.W.3d 780, 784 (Tex. App.—Austin 2000, pet. denied). The presumption does not shift the burden of proof, however, and stands only in the absence of evidence to the contrary. *City of Fort Worth v. Johnson*, 105 S.W.3d 154, 163 (Tex. App.—Fort Worth 2003, no pet.) (citing *Texas Nat. Res. Conservation Comm'n v. McDill*, 914 S.W.2d 718, 723 (Tex. App.—Austin 1996, no writ)). Therefore, once an employer produces sufficient evidence to support a finding of the nonexistence of a causal connection between the employee's termination and the report, the case then proceeds as if no presumption ever existed. *Chambers*, 31 S.W.3d at 784.

Here, the undisputed evidence shows that Vestal made his last report in October 2017 and that he was terminated in December 2017. Consequently, a presumption arises that Vestal was terminated due to his reporting, and in the absence of evidence to the contrary, this presumption is sufficient to create a genuine issue of fact on the element of causation. *See* Tex. Gov't Code § 554.004(a); *Johnson*, 105 S.W.3d at 163. Therefore, to prevail on its jurisdictional challenge based on its assertion that Vestal cannot produce legally sufficient evidence to support the element of causation, the Commission was required to first rebut this statutory presumption by producing at least some evidence to support a finding of the nonexistence of the causal connection.

On appeal, the Commission argues that Vestal cannot rely on the Act's presumption to defeat summary judgment because, in the Commission's view, the record conclusively shows that the individuals who made the final decision to terminate Vestal's

7

employment—Vestal's direct supervisor, Anthony Brown, and Brown's direct supervisor, Leslie Wilson—did not have any knowledge of Vestal's reports and that he was terminated for a legitimate, non-retaliatory reason that is unrelated to his alleged reports. In support of these assertions, the Commission relies on declarations by Brown and Wilson, attached to its motion for summary judgment. *See* Tex. R. Civ. P. 166(a)(f) (form of affidavit in support of or in opposition to summary judgment); *see also* Tex. Civ. Prac. & Rem. Code § 32.001 (providing that unsworn declaration may be used in lieu of affidavit "required by statute or required by a rule, order, or requirement adopted as provided by law").

According to Brown's declaration, Vestal was terminated due to his failure to follow Commission policy regarding the "wanding" of patients (i.e., the use of a hand-held metal detector). In his affidavit, in relevant part, Brown states:

4. On November 27, 2017, I initiated probationary separation (termination) because of Mr. Vestal's failure to follow [Commission] policy. My decision was based on information I received that while Mr. Vestal was at another facility hospital with a patient, he observed the patient conceal an item that appeared to be metal fork in his bedding. . . . Mr. Vestal returned to [the Hospital] with the patient, who was known to be high risk due to previous violent conduct but failed to wand the patient with a handheld metal detector when they arrived. Mr. Vestal also failed to inform anyone at [the Hospital] that there was a possible fork or other contraband in the patient's possession. A shank fashioned out of a fork was later found on [the Hospital's] premises. Based upon this incident alone, I found Mr. Vestal to be unsuitable for his position.

5. Mr. Vestal's failure to wand the patient and/or to report this incident placed the [Hospital] staff and all the other clients at risk for bodily injury and even death. The failure to wand a patient returning from off-campus visits is a violation of the [Hospital] Walk-through Metal Detector Policy. A true and correct copy of that policy is attached here as Exhibit 2. The policy requires, among other things, that hand-held detectors, or "wands," be used on all patients coming back from outside facilities. The purpose of this requirement is to properly screen all patients returning from outside facilities for items, including metal objects such as forks, that pose a threat to the safety and welfare of [Hospital] patients and staff and accordingly, are prohibited.

8

. . .

10.    On November 26, I received an email from [a nurse at the Hospital] informing me of the incident with Ethan Vestal and the fork/shank discovered at [the Hospital]. The following day, I forwarded that email to [Human Resources staff] and my supervisor, Leslie Wilson, indicating that I wanted to initiate probationary separation.

As to the reports made by Vestal, Brown states:

8.    On or about September 11, 2017, during my shift as nurse coordinator, I received a call from [a Hospital nurse] who indicated that Mr. Vestal witnessed [another employee] choke a patient. During our conversation, [the Hospital nurse] appeared to be very concerned and wanted to know what they should do. I instructed [the Hospital nurse] to have Mr. Vestal immediately report the incident to DFPS, and that anyone else who might have witnessed the incident needed to report it immediately as well.

9.    Termination of Mr. Vestal's probationary employment was in no way related to any alleged reports of violations of law that he made to DFPS and/or OIG. I was not even aware that Mr. Vestal had made any reports other than the report to DFPS regarding the incident involving Brian Alexander. In fact, because [Hospital] employees are required to report all abuse or neglect, it would be a violation of policy for Mr. Vestal not to report the incident he observed. Failure to report abuse, neglect or exploitation to DFPS is grounds for disciplinary action.

Similarly, in his declaration, Leslie Wilson states:

3.    In November 2017, I received notice that Mr. Vestal's probationary separation (or termination) was initiated by Anthony Brown, [Hospital] Nurse Manager, because of Mr. Vestal's failure to follow [Hospital] policy. I was informed that Mr. Vestal neglected to wand a patient upon return to [the Hospital] from an outside facility where he saw the patient stash an item that could have been a fork in his bedding. Mr. Vestal also failed to report the incident to anyone at [the Hospital] before a shank fashioned out of a fork was discovered on [Hospital] premises. The patient later admitted to hiding the fork, bringing it into [the Hospital], and fashioning a shank out of it. Mr. Vestal's failure to wand and report this incident endangered the safety of all patients and staff at [the Hospital]. Based upon this negligent conduct, I agreed with Mr. Brown's determination that Mr. Vestal was unsuitable for his position. No other factors formed the basis for my decision to approve Mr. Vestal's termination.

9

6.      Termination of Mr. Vestal's probationary employment was in no way related to any alleged reports of violations of law that he made to DFPS and/or OIG. I can state with personal knowledge and certainty that none of my decisions regarding Ethan Vestal were made with any intention of retaliating against him on any basis whatsoever. In fact, prior to his filing this lawsuit, I was not aware of any reports Mr. Vestal made regarding any alleged violations of law at [the Hospital].

We agree with the Commission's assertion that this evidence constitutes more than a scintilla of evidence that Vestal was terminated for reasons unrelated to his reporting of alleged violations of law. That is, the declarations are sufficient to support a finding that Vestal was terminated not based on any report of illegal activity but instead due to his negligent conduct in failing to follow the Commission's "wanding" protocols and policies. *See Chambers*, 31 S.W.3d at 784 (explaining that once an employer produces sufficient evidence "to support a finding of non-retaliation, the case proceeds as if no presumption [under Section 554.004(a)] ever existed"); *see also* Tex. Gov't Code § 554.004(b) ("It is an affirmative defense that the [employer] would have taken the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the fact that the employee made a report protected under this chapter of a violation of law."). Consequently, we conclude that application of the statutory presumption, standing alone, is insufficient to support the trial court's jurisdictional ruling in this case.

We disagree, however, with the Commission's assertion that Wilson's and Brown's declarations conclusively establish that the individuals responsible for the decision to terminate Vestal's employment were unaware of the reports of illegal conduct that are the basis of Vestal's claim. Although the parties agree that Brown and Wilson were responsible for the decision to terminate Vestal's employment, the declarations establish that Brown, Vestal's direct

10

supervisor, was aware of at least one of the incidents that Vestal reported—specifically, the September 2017 incident that led to Vestal's first report to the DFPS. Moreover, Brown acknowledges in his declaration that he was aware that Vestal made "the report to DFPS regarding the incident involving Brian Alexander" and that it would have been a violation of Commission policy for Vestal to have not reported the incident.

Further, in his response to the Commission's plea and motion for summary judgment, Vestal attached Brown's and Wilson's deposition testimony as evidence in support of his Whistleblower Act claim. In his deposition, Brown acknowledged receiving an e-mail in November 2017 from nursing coordinator Nakia Cole, in which Cole explained that she was having "issues finding an [overtime] assignment for [Vestal] . . . due to RNs not wanting him working on the Unit, under their supervision, under their license." According to the e-mail, one of the nurses reported to Cole that she believed Vestal was mentally unstable and was "on a mission to do God's work and clean house here." Brown denied that the issue with the nurses was related to Vestal's reporting but admitted that he did not investigate further into the reasons for the nurses' refusals to work with Vestal.

Similarly, in his deposition, Wilson recounted a meeting that he had with Vestal after a nurse manager reported to him that "staff were not wanting [Vestal] to work over there." During that meeting, Vestal told Wilson that he believed that he was having a problem with his co-workers because "people just don't like me" and "they think I'm going to turn them in." When Wilson was asked in the deposition what he thought Vestal meant by "turn them in," Wilson explained, "I had assumed it was about our DFPS program or abuse and neglect allegation program—you know, protocol and what we have to do. But, you know, I also told him everybody has to do that, that it's required of all employees that they suspect or have

11

knowledge of." Therefore, although Wilson denied in his declaration that he was actually aware of any of Vestal's reports prior to this lawsuit, Wilson's deposition testimony suggests that Vestal, in fact, informed Wilson that his co-workers were hostile towards him and that, in Vestal's view, this was due to his reporting of illegal conduct.

"In determining causation, we focus on those with authority in the decision-making process that resulted in the adverse employment action and whether there is evidence 'that the decision-maker or decision-makers' acted with retaliatory motive." *Rodriguez*, 605 S.W.3d at 193. Here, the evidence suggests that when Vestal was terminated, the Hospital employees responsible for that decision (Brown and Wilson) knew that he had reported illegal conduct at least once during his 6-month employment. *See id.* (recognizing that "knowledge of the report is a form of circumstantial evidence"). In addition, more than a scintilla of evidence exists that Brown and Wilson knew that Vestal was having problems with his co-workers and that Vestal believed those problems were because of his reporting; however, neither Brown nor Wilson investigated the issue further. Instead, within a month of his last report, and the same month that Cole reported that nursing staff did not want to work with Vestal, Brown initiated the termination of Vestal's employment. *See id.* ("The time that passes between the protected conduct and the adverse personnel action is also relevant to any causal connection.").

Viewing the evidence in the light most favorable to Vestal, we conclude that a genuine issue of material fact exists as to whether Vestal's reporting was a but-for cause of the Commission's decision to terminate his employment when it did. Consequently, the trial court did not err in denying the Commission's jurisdictional challenge on this ground.

12

## CONCLUSION

Having overruled the Commission's sole issue on appeal, we affirm the trial court's order denying the Commission's plea to the jurisdiction and motion for summary judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, Kelly

Affirmed

Filed:   December 10, 2020